**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **GMAC, LLC,** | ) | **Case No. 06 C 03619** |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Magistrate Judge** |
| **vs.** | ) | **P. Michael Mahoney** |
| | ) | |
| **EINER HILLQUIST and NEIL** | ) | |
| **HILLQUIST,** | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

## I. INTRODUCTION

Plaintiff, GMAC, LLC, has filed a six-count, sixth amended complaint against defendants, Einer Hillquist and Neil Hillquist, concerning the sale of 11 vehicles financed by GMAC and sold by Fargo Motors, Inc., for which GMAC never received payment. In its complaint, GMAC seeks to pierce the corporate veil as to both Einer and Neil and alleges the following: breach of contract against Einer (Count I), fraud against Einer (Count II), fraud against Einer and Neil (Count III), conspiracy to commit fraud by Einer and Neil (Count IV), accounts stated against Einer and Neil (Count V), and conversion against Einer and Neil (Count VI).

All three parties have filed motions for summary judgment. All three parties seek summary judgment as to the issue of corporate veil piercing. GMAC and Einer each move for summary judgment in their favor on all six counts. In addition, Einer moves for summary judgment on two affirmative defenses. Neil moves for summary judgment on Counts III–V.

## II. BACKGROUND

1

Einer owned and operated a car dealership known as Fargo Motors in Sycamore, Illinois from 1975 until March 11, 2004. Fargo Motors was operated as a sole proprietorship, and as such, Einer was personally liable for its debts and obligations. In June 1978, GMAC and Einer executed a Wholesale Security Agreement whereby GMAC agreed to provide financing to Fargo Motors to pay for vehicles that were part of Fargo Motor's floor plan. Pursuant to the agreement, GMAC took a security interest in the vehicles and in the proceeds from the sale thereof. Upon sale of the vehicles, Fargo Motors agreed to remit to GMAC the funds for the vehicles plus interest. On February 25, 2004, Einer also signed a General Security Agreement granting GMAC security interests in other certain properties owned by Fargo Motors.

Neil, Einer's son, worked as general manager of Fargo Motors from 1976 until March 11, 2004. Einer and Neil testified that, in December 2003, they began discussing the idea of incorporating the dealership so that Einer could pass it on to Neil. On March 11, 2004, Neil and Einer formed an Illinois corporation called Fargo Motors, Inc. ("FMI"). Neil testified that they formed FMI because Einer was no longer actively involved in the business. Einer took the position of president and Neil became secretary and treasurer. FMI was capitalized with $36,000 and stock was distributed. Einer took a 75% interest and Neil took a 25% interest.

FMI began operations as an automobile dealership at the same location as Fargo Motors. Neil acted as the general manager of the corporation and was in charge of the operations of FMI, a job similar to the one he had previously held with Fargo Motors. He was paid an annual salary of $20,000 by FMI. There was no change in the business address or the dealership employees as a result of the incorporation. The sign outside the building was not changed to reflect the incorporation. The phones were answered as they had been in the past. FMI used the same bank

account as Fargo Motors.  Neither Neil nor Einer notified GMAC of the change in corporate structure.

On November 3, 2004, Donna Malina, a portfolio manager for GMAC, sent a letter to Fargo Motors to the attention of Einer seeking a personal financial statement.  Einer never responded to the letter.  Around December 29, 2004, Malina apparently discovered that Fargo Motors had changed its corporate structure.  Malina then filed an amended financial statement reflecting a change in borrower from Fargo Motors to FMI, and informed Neil that she would be sending correspondence to FMI related to the change in corporate structure.  After that, no billing statements were addressed to Fargo Motors.  On January 3, 2005, Malina sent a letter addressed to FMI to Neil's attention which sought signatures on various corporate documents.  One such document sought to add Einer as a personal guarantor to FMI's debts.  When FMI and Einer did not return the documents signed, Malina made follow-up phone calls to Neil on February 7 and March 4, 2005.  During those calls, Neil indicated that he would verify whether the corporate collateral loan documents had been signed.

GMAC transferred the Fargo Motors file to Kenn Iribe, a portfolio manager, in March 2005.  Iribe re-sent the documents to FMI for signatures, and had telephone conversations with Neil regarding the documents on June 28 and July 25, 2005.  The exact substance of these conversations is in dispute.  The documents were never signed or returned.

At the end of July 2005, Neil and Einer met with an attorney to discuss the possibility of FMI filing for bankruptcy.  Allegedly on the advice of FMI's bankruptcy attorney, neither Neil nor Einer executed the collateral documents as requested by GMAC.  FMI filed for Chapter 11 bankruptcy on August 5, 2005.

Both before and after GMAC learned of the change in corporate structure of Fargo Motors to FMI, it advanced money with which FMI purchased vehicles for its floor plan. The proceeds from the sale of a vehicle were put into FMI's general operating bank account. Remittance was drawn from that account and paid to GMAC usually within five days of the sale.

FMI sold one vehicle in May, one in June, and nine in July for which it never remitted funds to GMAC. Neil testified that the money from those sales was drawn from FMI's account to pay other bills. One such bill was a rent payment made to an investment company owned by Einer and from which FMI leased its property. At the end of July 2005, GMAC sent FMI a billing statement which indicated the amounts due to GMAC. As of the period ending July 30, 2005, the total outstanding amount owed on the 11 vehicles was $284,538.17.

## III. DISCUSSION

### A. Statement of the Law

A court may only grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In evaluating such a motion, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Id.* at 490. The court must draw all reasonable inferences in the light most favorable to the party opposing the motion. *Id.* In considering cross-motions for summary judgment, the court views all facts and draws all reasonable inferences "in a light most favorable to the party against whom the motion

under consideration is made." *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 626 (7th Cir. 2005) (quotation marks omitted). If the moving party bears the burden of persuasion at trial, that party must support its motion with credible evidence to show that, even in the absence of an adequate response by the nonmovant, it is entitled to judgment as a matter of law. *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006); *Arnett v. Myers*, 281 F.3d 552, 562 (6th Cir. 2002); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting) (The moving party "must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."). Moreover, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact by identifying with reasonable particularity the evidence upon which the party relies. *Hemsworth*, 476 F.3d at 489–90.

## B. Count I—Breach of Contract as to Einer

To prove a breach of contract, the plaintiff must prove "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Vill. Of S. Elgin v. Waste Mgmt. of Ill., Inc.*, 348 Ill. App. 3d 929, 810 N.E. 2d 658, 669 (Ill. App. Ct. 2004). Neither party disputes that the Wholesale Security Agreement and the General Security Agreement were valid contracts between GMAC and Fargo Motors. Fargo Motors ceased on March 11, 2004, at which time FMI was formed. GMAC discovered the dissolution of Fargo Motors and the formation of FMI around December 29, 2004. The 11 vehicles at issue in this litigation, for which no remittance was given GMAC, were sold by FMI in May, June, and July 2005.

After December 29, 2004, GMAC could have repossessed its vehicles or stopped the credit line. Instead, GMAC knowingly continued to finance vehicles for FMI. Upon sale of a vehicle, GMAC expected remittance from FMI. When FMI failed to remit funds owed to GMAC, it breached an agreement. A breach of contract claim appears properly asserted against FMI, not Einer.

Normally, these circumstances warrant summary judgment for Einer. However, GMAC asserts three theories as to why Einer is personally liable for the funds that FMI did not remit to GMAC: (1) the court should pierce the corporate veil of FMI; (2) successor liability flows from Fargo Motors to FMI; and (3) Einer personally guaranteed the debts of FMI to GMAC. If any of these theories are viable, Einer may be liable for FMI's breach. GMAC also argues that the corporate veil should be pierced as to Neil.

## 1. Piercing the Corporate Veil

The court will address GMAC's motion for summary judgment as to piercing the corporate veil with regard to both Einer and Neil in this section. In Illinois, "a corporation is a legal entity separate and distinct from its shareholders, directors and officers, and, generally from other corporations with which it may be affiliated." *Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 569 (7th Cir. 1985). To pierce the corporate veil, a plaintiff must satisfy a two prong test. First, the plaintiff must prove that there is a unity of interest and ownership such "that the separate personalities of the corporation and the individual or other corporation no longer exist." *Id.* at 569–70. In evaluating the unity of interest and ownership between a corporation and an individual, courts consider the following factors:

(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe

corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a shareholder; (10) failure to maintain arm's length relationships among related entities; and (11) whether the corporation is a mere facade for the operation of the dominant shareholders.

*Wachovia Sec., LLC v. Neuhauser et al.*, 528 F. Supp. 2d 834, 854–55 (N.D. Ill. 2007) (*quoting*

*Dimmit & Owens Fin., Inc. v. Superior Sports Prods., Inc.*, 196 F. Supp. 2d 731, 738 (N.D. Ill.

2002)).  Second, the plaintiff must show that circumstances exist "such that adherence to the

fiction of [a] separate corporate existence would sanction a fraud or promote injustice." *Id*. at

570.

In this case, there are undisputed facts that weigh in favor of both sides' arguments.

Undisputed facts in favor of Einer's and Neil's motions are the following.  When FMI was

formed on March 11, 2004, Einer and Neil held a corporate meeting.  At that meeting, Einer and

Neil executed and completed an Authentication of Record Book and Records, filed the articles of

incorporation, adopted by-laws, signed a commercial building lease, and executed a bill of sale

and assignment of personal property for the transfer of Fargo Motors' assets.  FMI was

capitalized with $36,000, and shares were issued whereby Einer took a 75% interest and Neil

took a 25% interest.  Einer took the position of corporation president, and Neil was the corporate

secretary and treasurer.  Neil also continued to work as general manager of the dealership, and

was paid a salary of $20,000 annually by the corporation.  On March 31, 2004, Neil and Einer

executed a shareholder agreement.  An annual meeting was held sometime thereafter.  Two

meetings were held in July 2005 to discuss the impending bankruptcy.  These facts suggest that

FMI existed as a separate entity from either Einer or Neil.

Undisputed facts also support GMAC's motion. For example, no minutes were recorded at any corporate meetings. FMI was located at the property formerly occupied by Fargo Motors. Neil remained manager and employed the same people. Einer had the dominant interest in both FMI and Fargo Motors. FMI did not change its sign to reflect that it had replaced Fargo Motors. FMI did not send notice to its customers to signal them of the change. The employees of FMI answered the phones in the same way as had the employees of Fargo Motors. These facts indicate a unity of interest and ownership between Einer and FMI, and possibly Neil and FMI.

Conflicting evidence puts several material facts in dispute. First, parties argue about the true solvency of FMI when it was formed. Although shares were sold for $36,000, FMI filed for bankruptcy a little over a year after incorporation. The court is unsure whether $36,000 was adequate capitalization. Financial evidence, including bank statements and balance sheets, may prove undercapitalization.

Also, the full extent of corporate formalities with which FMI complied is in dispute. FMI failed to keep meeting minutes. Topics discussed or voted on at the meetings are unknown. Einer testified that the annual meeting lasted about five minutes.

Parties also dispute Einer's true role in the operations of FMI. Einer asserts that he withdrew from the operations of FMI and that he was a "silent partner" of sorts. If true, he was a nonfunctioning corporate president. That fact might weigh in favor of piercing the veil. The court needs more information on the tasks with which he was charged in his role as president.

FMI made a large rent payment to an investment company owned by Einer shortly before it filed bankruptcy. This activity is highly suspicious and indicates a lack of an arms length transaction. However, the exact relationship between the investment company, FMI, Einer, and

Neil is unknown.

All said, the facts appear slightly in favor of piercing the veil. But, there are enough material facts in dispute to frustrate granting GMAC's motion for summary judgment as to either Einer or Neil. If Einer and Neil can show that FMI was adequately capitalized upon formation, that the corporate meetings were taken seriously and used to conduct corporate business, that Einer's role as president was not illusory, or that payment to Einer's investment company was not merely a diversion of corporate funds to Einer, piercing the corporate veil may not be appropriate. Thus, the court denies all parties' motions for summary judgment on this theory of liability.

## 2. Successor Liability

GMAC argues that FMI is a successor in liability to Fargo Motors. "The well-settled general rule is that a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation." *Vernon et al. v. Schuster*, 179 Ill. 2d 338, 688 N.E.2d 1172, 1175 (Ill. 1997). "The traditional rule of successor corporate nonliability developed as a response to the need to protect bonafide purchasers from unassumed liability and was designed to maximize the fluidity of corporate assets." *Id*. (internal quotes and citations omitted). Four exceptions to this general rule exist: "(1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." *Id*. at 1175–76. Where a sole proprietor transfers all his assets to a corporation in exchange for a majority share in the corporation, that corporation may have assumed the

liabilities of the proprietorship. *Plaza Express Co. v. Middle States Motor Freight, Inc.*, 40 Ill. App. 2d 117, N.E.2d 382, 384 (Ill. App. Ct. 1963). These exceptions were developed to "offset the potentially harsh impact of the rule [and to] protect the rights of corporate creditors after dissolution." *Vernon*, 688 N.E.2d at 1175.

This theory of liability is misplaced. Had Einer tried to escape debt incurred by Fargo Motors with dissolution of the sole proprietorship and a sale of its assets to FMI, the court might find FMI a "mere continuation" of Fargo Motors and hold FMI liable for those debts. That is not what appears to have happened here. The debts at issue in this case were incurred by FMI, the successor entity. They were incurred over a year after FMI's formation. GMAC had been aware of FMI's formation for months prior to the first sale out of trust. GMAC had ample opportunities to protect its rights against FMI. It could have repossessed its vehicles or discontinued the credit line. Successor liability is not a viable claim against Einer for the debts of FMI. The court denies GMAC's motion for summary judgment on this theory.

### 3. Einer's Guarantee

An individual operating a sole proprietorship is personally responsible for the debts of the proprietorship. *Packard Bell Elec. Corp. v. Ets-Hokin*, 509 F.2d 634, 637 (7th Cir. 1975). If that individual separately guarantees the debt of the sole proprietorship, he is guaranteeing debts for which he is already obligated; that second guarantee serves no purpose. *Id.* If the proprietorship is dissolved and a corporation is formed in its place, the individual's obligations under the proprietorship do not extend to the corporation unless so contracted. *Id.* at 636.

Where a sole proprietor incorporates solely to defeat an otherwise applicable guarantee and uses the incorporation to the detriment of another, the court may hold the individual liable

under the doctrine of equitable estoppel. "Equitable estoppel arises only when one has so acted as to mislead another and the one thus misled has relied upon the action of the inducing party to his prejudice." *Id*. at 637 (internal quotes omitted). "Reliance is an essential element of equitable estoppel and absent reliance, the doctrine does not apply." *Id*.

Einer, as sole proprietor, was the same legal entity as Fargo Motors; the obligations of Fargo Motors and Einer were one in the same. The General Wholesale Agreement and the General Security Agreement were contracts between GMAC and Einer O. Hillquist d/b/a Fargo Motors. Einer did not sign a personal guarantee outside of these contracts because Einer was already personally liable.

Einer did not contractually guarantee any of the debts of FMI. However, if Einer acted to mislead GMAC into financing vehicles for which remittance was never paid, and GMAC relied on Einer's actions in providing that financing, Einer may be liable for those actions under the doctrine of equitable estoppel.

At some point after GMAC learned of FMI's formation, any misrepresentations made by Einer prior to its formation were neutralized. GMAC is a sophisticated lender and knew that the Wholesale Security Agreement and General Security Agreement constituted contracts with Einer, not FMI. Upon discovering FMI's formation, GMAC could have severed the line of credit or repossessed vehicles at any time. Instead, GMAC continued to finance vehicles. All 11 vehicles in question were sold out of trust after GMAC discovered FMI's formation. Equitable estoppel is inappropriate under these facts. The court denies GMAC's motion for summary judgment on GMAC's theory that Einer's personal guarantee survived the formation.

C. Count II—Fraud Against Einer

To establish a claim of common law fraud, a plaintiff has the burden of showing the following: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 675 N.E.2d 584, 591 (Ill. 1996).

Initially, it is important to distinguish the allegations against Einer in Counts II and III. GMAC's briefs do not separate its arguments as to these two counts. Although Count II is entitled "Fraud (Against Defendant Einer Hillquist)," it does not allege any of the elements of fraud. It is devoid of any allegation that Einer made a false statement, or that he intended to induce GMAC to rely on such a statement in any way. Rather it is identical to GMAC's allegations in its breach of contract claim stated in Count I. Einer argues that as a result Count II fails to meet the threshold requirements of Federal Rule of Civil Procedure 9(b). This court agrees.

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ." A complaint alleging fraud must provide "the who, what, when, where, and how" of the alleged fraudulent action. *Borsellinoi v. Gold man Sachs Group, Inc.*, 477 F.3d 503, 507 (7th Cir. 2007) (quotation marks omitted). Rule 9(b) "require[s] the plaintiff to state 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (quoting *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.1992)). GMAC's allegations of fraud in Count II against Einer are

woefully deficient.  It does not mention any misrepresentations, much less specifics about those misrepresentations.  GMAC has failed to meet its burden.  As such, the court grants Einer's motion for summary judgment as to Count II.  The court denies GMAC's motion for summary judgment on Count II.

### D.  Count III—Fraud Against Einer and Neil

In Count III, GMAC alleges fraud as to both Einer and Neil.  GMAC first argues that Einer committed fraud by failing to disclose his intent to convert Fargo Motors to FMI when he signed the General Security Agreement on February 25, 2004.  Einer's omission does not satisfy a claim for fraud.  GMAC discovered the formation of FMI over three months prior to FMI selling any vehicles out of trust.  At the time FMI made those sales, GMAC was no longer relying on Einer's omission.  The court grants Einer's motion for summary judgment on this theory of fraud.

The second theory put forth by GMAC is that Neil made fraudulent statements to GMAC during each of the phone conversations that occurred between January 2005 and August 2005.  GMAC argues that those statements are attributable to Einer as well as Neil because Neil acted as Einer's agent.

During the phone conversations, GMAC inquired whether the corporate documents, including Einer's personal guarantee on FMI's debts, had been executed.  GMAC asserts that the following statements were made during the phone conversations: On February 7, 2005, Neil "advised Donna Malina that he would verify if the necessary Documents had been signed" (Compl. ¶ 51.); on March 4, 2005, Neil "advised that he would look into the status of the Documents" (*Id*. ¶ 53); on June 28, 2005, Neil "assured [Iribe] that [Einer and Neil] would

execute the documents and return the same to GMAC" after they resolved some computer problems (*Id.* ¶ 57, 58); and on July 25, 2005, Neil stated that he "would cause the Documents to be executed by both [Einer and Neil] by the end of the week and that he would send them to GMAC" (*Id.* ¶ 60). The documents were never executed, and FMI filed for bankruptcy on August 5, 2005.

Neil's statements to GMAC constitute promises to execute, or promises to have Einer execute, the corporate documents. "[P]romissory fraud, involving a false statement of intent regarding future conduct, is generally not actionable under Illinois law unless the plaintiff also proves the act was a part of a scheme to defraud." *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc. et al.*, 493 F.3d 841, 853 (7th Cir. 2007). A scheme to defraud is one were there is "a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." *Desnick v. Am. Broadcasting Cos., Inc. et al.*, 44 F.3d 1345, 1354 (7th Cir. 1995). Without such a high standard, every breach of contract claim might also constitute a claim of fraud. *Id.* Corporate officers are personally liable for the torts of the corporation if the officer actively participated in the tort. *Nat'l Acceptance Co. of Am. v. Pintura Corp. et al.*, 94 Ill. App. 3d 703, 418 N.E.2d 1114, 1117 (Ill. App. Ct. 1981).

The scheme in which Neil allegedly participated involved misrepresenting that the corporate documents would be executed. These misrepresentations allegedly were intended to keep GMAC at bay while FMI sold 11 vehicles out of trust, used their proceeds to pay off certain debts, and then filed for bankruptcy.

Neil's statements, considered with the facts of the case, suggest that Neil may have schemed to defraud GMAC. The money owed to GMAC was commingled with FMI's general

operating funds and used to pay debts owed to other creditors, including Einer's investment company from which FMI rented its property. Also, ten of the vehicles in question were sold in June and July, and FMI filed for bankruptcy in early August. As late as July 25, Neil allegedly gave assurances to GMAC that the corporate papers were being executed. This timing is suspect.

Further, in "late July," Neil and Einer met with the bankruptcy attorney who allegedly advised Einer not to sign the personal guarantee. It is unclear whether that meeting occurred before or after Neil gave Iribe assurances on July 25. If the meeting with the bankruptcy attorney occurred before July 25, Neil's assurances could constitute fraud.

Although the facts are suspicious, the evidence is not consistent regarding Neil's knowledge and intent. Material facts exist in dispute. The court denies GMAC's motion for summary judgment on Count III as to Neil. The court also denies Neil's motion for summary judgment on Count III.

GMAC argues that Neil's alleged fraud is attributable to Einer because Neil acted as Einer's agent. Under Illinois law, "[t]he test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Chemtool, Inc. v. Lubrication Tech., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998) (citing cases). "Agency can arise when an agent has either 'actual' or 'apparent' authority to act on the principal's behalf." *Caterpillar, Inc. et al. v. Usinor Industeel et al.*, 393 F. Supp. 2d 659, 670 (N.D. Ill. 2005) (internal quotes omitted). Actual authority exists where the "principal's words or actions would lead a reasonable person in the agent's position to believe that he or she was so authorized" to

act on the principal's behalf.  *Id*.  Apparent authority exists where an agent acts in relation to a third party and the words or actions of the principal "would lead a reasonable person in the third party's position to believe that the principal had so authorized the agent" to act on his behalf.  *Id*.  "The existence and scope of an agency relationship are questions of fact."  *Tribett v. BNC Mortgage, Inc. et al.*, 2008 U.S. Dist. LEXIS 3573, at *13 (N.D. Ill. Jan. 17, 2008).

GMAC asserts that Neil acted with actual or apparent authority on behalf of Einer.  This assertion is based on the fact that Neil was the general manager of Fargo Motors.  At that time, Neil had actual authority to act as Einer's agent.  After the formation of FMI, Neil continued to act as general manager of FMI.  Because Einer did not disclose the formation of FMI to GMAC, GMAC argues that Neil continued to act with actual and apparent authority on behalf of Einer after the formation of FMI.  According to GMAC, Neil was acting on Einer's behalf when he allegedly misrepresented that he and Einer would sign the corporate papers.

GMAC has offered no evidence to suggest that Neil had actual authority to speak and act on Einer's behalf after the formation of FMI.  Any actual authority that presumably existed when Neil served as general manager to Fargo Motors disappeared when Fargo Motors was dissolved.  Neil testified that Einer was not even aware that the corporate papers existed until July 2005.  Thus, Einer could not have given Neil actual authority to represent that a signature on those papers would be forthcoming.

Apparent authority is also lacking.  All of the allegedly fraudulent statements were made by Neil after GMAC discovered the formation of FMI.  GMAC may have logically assumed that Neil spoke on behalf of Einer when it believed to be dealing with Fargo Motors.  After it discovered the formation of FMI, though, GMAC could not have reasonably assumed that Neil's

16

statements, especially those regarding the corporation, were on behalf of Einer. At that time, Neil was employed as general manager of FMI, for which he earned a salary. He was also a corporate officer and a minority shareholder. A reasonable person would assume that Neil's statements were those of FMI, not of Einer.

Inasmuch, Neil's allegedly fraudulent statements are not attributable to Einer because Neil was not Einer's agent under theories of actual or apparent authority. The court grants Einer's motion for summary judgment as to Count III, and denies GMAC's motion for summary judgment on Count III as to Einer.

### E. Count IV—Conspiracy to Commit Fraud Against Einer and Neil

"The elements of a cause of action for conspiracy to defraud are [the following]: (1) a conspiracy; (2) an overt act of fraud in furtherance of the conspiracy; and (3) damages to the plaintiff as a result of the fraud." *Bosak v. McDonough*, 192 Ill. App. 3d 799, 549 N.E.2d 643, 646 (Ill. App. Ct. 1989). "Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock v. Brakegate, Ltd. et al.*, 164 Ill. 2d 54, 645 N.E.2d 888, 894 (Ill. 1994). It is "an intentional tort and requires proof that a defendant 'knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act or a lawful act in an unlawful manner.'" *McClure et al. v. Owens Corning Fiberglass Corp. et al.*, 188 Ill. 2d 102, 720 N.E.2d 242, 258 (Ill. 1999) (*quoting Adcock*, 645 N.E.2d at 894). "Accidental, inadvertent, or negligent participation in a common scheme does not amount to conspiracy." *Id*. "Mere knowledge of the fraudulent or illegal actions of another is also not enough to show a conspiracy." *Id*. "Similarly, a defendant who innocently performs an act which happens to

fortuitously further the tortuous purpose of another is not liable under the theory of civil conspiracy." *Id.*

A plaintiff can prove conspiracy using circumstantial evidence and inferences drawn from that evidence. *Id.* If a plaintiff opts to show conspiracy using circumstantial evidence, that evidence must be clear and convincing. *Id.*

The court already held that issues of fact exist regarding Neil's alleged fraudulent statements. If Neil committed fraud, the facts may also show that Einer participated in the conspiracy. This is true even though there is no evidence that Einer made a fraudulent statement.

Einer was actively engaged in the business of Fargo Motors. He signed a security agreement with GMAC about two weeks prior to forming FMI. After FMI's formation, Einer claims to have become somewhat of a "silent partner" of the business. However, he became president—a position typically of considerable power and oversight regarding normal business decisions. He also held the majority of the stock, allowing him to outvote Neil on any major decisions. Einer visited the dealership a couple of times a week. One would expect him to be abreast of any significant developments in FMI's business.

Neil used the funds gained from his allegedly fraudulent behavior to pay Einer's investment company a large rent payment. Thus, Einer reaped the benefit of Neil's alleged fraud. It is not lost on the court that Neil is Einer's son.

These circumstances present a genuine issue of fact as to whether Einer and Neil conspired to commit fraud. Neil may have committed the actual fraud, but it is possible that they both acted in furtherance of a conspiracy to commit fraud. The court denies Einer's and Neil's

motions for summary judgment on this count. Because there still exist genuine issues of fact, the court also denies GMAC's motion for summary judgment on this count.

### F. Count V—Account Stated as to Einer and Neil

"An account stated is an agreement between parties who previously engaged in transactions that the account representing those transactions is true and the balance stated is correct, together with a promise for the payment of the balance." *Dreyer Med. Clinic, S.C. v. Corral*, 227 Ill. App. 3d 221, 591 N.E.2d 111, 114 (Ill. App. Ct. 1992). "[A]n account stated cannot be made the instrument to create an original liability; it merely determines the amount of the debt where liability previously existed." *Id*. It is "a form of proving damages for the breach of a promise to pay on a contract." *Id*.

GMAC discovered in December 2004 that it was dealing with FMI and not Fargo Motors. The 11 vehicles at issue were sold by FMI after GMAC's discovery of the incorporation. The billing statement on which GMAC bases its account stated claim, showing a debt of $284,538.17, was issued to FMI in late July 2005. GMAC's account stated claim is against FMI, not Einer. Inasmuch, the court grants Einer's motion for summary judgment as to Count V.

GMAC never had a contractual relationship with Neil. Neil was an employee of Fargo Motors until its dissolution. After that, Neil was an employee of FMI. The court grants Neil's motion for summary judgment as to Count V. The court denies GMAC's motions for summary judgment as to both Einer and Neil on Count V.

### G. Count VI—Conversion as to Einer and Neil

To establish conversion, a plaintiff must show that "(1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 184 Ill. 2d 109, 703 N.E.2d 67, 70 (Ill. 1998).

"Money may be the subject of conversion, but it must be capable of being described as a specific chattel, although it is not necessary for purposes of identification that money should be specifically earmarked." *In re Thebus*, 108 Ill. 2d 255, 483 N.E.2d 1258, 1260 (Ill. 1985). "[C]onversion will not lie for money represented by a general debt or obligation." *Id.* at 1261; *Eggert v. Weisz et al.*, 839 F.2d 1261, 1265 (7th Cir. 1988). "[I]t must be shown that the money claimed, or its equivalent, at all times belonged to plaintiff and that the defendant converted it to his own use." *Gen. Motors Corp. v. Douglass*, 206 Ill. App. 3d 881, 565 N.E.2d 93, 98 (Ill. App. Ct. 1990).

In this case, the proceeds of the vehicle sales did not instantly belong to GMAC. The Wholesale Security Agreement required that remittance occur "promptly." FMI typically remitted funds from a sale within five days. But, that was not always the case. FMI sold its first vehicle out of trust on March 25, 2005. When FMI did not remit the funds within five days, GMAC simply carried the balance owed over to the next month. On June 28, 2005, FMI sold another vehicle out of trust while still owing remittance on the March sale. GMAC carried the balance owed for the sale of both vehicles over to July. Nine more vehicles were sold out of trust in July. FMI did not file for bankruptcy until August 5, 2009. GMAC's practice of carrying the debt over indicates a debtor-creditor relationship.

Also, GMAC did not require that Fargo Motors or FMI keep funds owed in a separate account or trust. Toni Carlson, FMI's secretary, testified that upon sale of a vehicle, the sale's proceeds would typically be deposited in the corporation's one and only bank account the following day. This also indicates a debtor-creditor relationship.

The money owed GMAC is not specifically identifiable. Conversion is not an appropriate remedy. The court grants Einer's and Neil's motions for summary judgment on Count VI. The court denies GMAC's motion for summary judgment on Count VI.

## H. Einer's Affirmative Defenses

Einer asserts two affirmative defenses to Count I (breach of contract) and Count VI (conversion): (1) a novation occurred; and (2) waiver. This court granted Einer's motion for summary judgment as to Count VI. Therefore, the court only needs to address these defenses with regard to Count I.

As discussed in Count I, FMI breached the agreement with GMAC when it failed to remit funds. Einer is only liable for the breach if facts emerge to sustain corporate veil piercing. This theory treats Einer and FMI as the same legal entity, with the same debts. Novation and waiver are not viable affirmative defenses under this theory. The court denies Einer's motion for summary judgment as to his affirmative defenses.

## IV. CONCLUSION

The court grants Einer's motion for summary judgment as to Counts II, III, V, and VI. The court denies Einer's motion for summary judgment as to Count I because Einer might be personally liable for a breach of contract under a theory of corporate veil piercing. The court

also denies Neil's motion for summary judgment as to corporate veil piercing. The court denies Einer's motion for summary judgment as to Count IV. The court denies GMAC's motions for summary judgment against Neil and Einer as to all counts. The court denies Neil's motion for summary judgment as to Counts III and IV. The court grants Neil's motion for summary judgment as to Counts V and VI. The court denies Einer's motion for summary judgment as to his affirmative defenses of novation and waiver.

ENTER:

_____

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE:        August 19, 2009